[Cite as *State v. Hart*, 2022-Ohio-4550.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29252 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-2749/1 |
| | : | |
| BYRON HART | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of December, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ANTHONY J. RICHARDSON, II, Atty. Reg. No. 0097200, P.O. Box 468, Perrysburg, Ohio 43552
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Byron Hart was found guilty, following a jury trial, on the following counts: Count 1, improperly discharging a firearm at or into a habitation, with a three-year firearm specification; Count 2, aggravated possession of drugs (5 times bulk but < 50 times bulk); Count 3, failure to comply with an order or signal of a police officer (serious physical harm/substantial risk); Count 4, having weapons while under disability (prior offense of violence); Count 5, having weapons while under disability (fugitive from justice); Count 6, tampering with evidence (alter/destroy); Count 7, improper handling of a firearm in a motor vehicle (loaded/no license); and Count 8, falsification (public official). Counts 1 and 2 were felonies of the second degree, Counts 3-6 were felonies of the third degree, Count 7 was a felony of the fourth degree, and Count 8 was a misdemeanor of the first degree. The court found that Counts 4 and 5 were subject to merger, and the State elected to procced to sentencing on Count 5. The court imposed the following sentence: on Count 1, "a definite sentence of eight (8) years with an indeterminate sentence of twelve (12) years," with a mandatory three additional years of incarceration on the firearm specification; on Count 2, "a definite term of eight (8) mandatory years with an indeterminate sentence of twelve (12) years"; on Counts 3, 5, and 6, 36 months each; on Count 7, 18 months; and on Count 8, 180 days local jail time. The court ordered that the prison terms for Count 1-7 were to be consecutively, for an aggregate term of 29.5 years to 33.5 years. The court ordered Hart to pay court costs and restitution to the victim in the amount of $4,507.43. With respect to Count 3, the court also imposed a mandatory lifetime driver's license suspension.

{¶ 2} Hart was indicted on the above charges on August 28, 2019. Attorney

Christopher Fogt was appointed to represent him, and he pled not guilty. On September 11, 2019, Attorney Michael Pentecost entered a notice of appearance to represent Hart. Defense counsel filed motions to continue the matter on September 11, September 25, and October 2, 2019. The motions were granted. On October 3, 2019, Attorney Jay Carter was appointed to represent Hart. He filed motions to continue on October 9, 2019, October 23, 2019, and October 31, 2019. On November 6, 2019, the court set the matter for trial on March 9, 2020.

{¶ 3} On January 8, 2020, the court issued a detainer order and entry, noting that Hart was confined at the Madison Correctional Institution. On February 13, 2020, Hart was booked into the Montgomery County Jail. On February 28, 2020, counsel for Hart filed a motion to dismiss, asserting that his right to a speedy trial had been violated. The motion argued that Hart had been incarcerated in Montgomery C.P. No. 2018-CR-1754[1] on August 27, 2019, and that a warrant to convey had been filed on August 29, 2019, but Hart was not conveyed to a state institution until November 7, 2019. Hart argued that the State's failure to convey him for 71 days indicated that "his speedy trial time should be calculated pursuant to the triple-count provision in R.C. 2945.71(E)." He also argued that the State's failure to convey him to a state institution for 71 days for the offense charged in Case No. 2018-CR-1754 was "equivalent to him being held solely on the instant charge" and that the State therefore failed to bring him to trial within 90 days of his arrest and confinement. The motion further asserted that Hart had "not agreed to, or suggested" any of the continuances requested by counsel. He argued that he had been

---

[1] The trial court's docket in Case No. 2018-CR-1754 reflects that a capias was issued for Hart for failure to appear, and he was arrested on August 18, 2019, in that case.

denied R.C. 2941.401 relief by the State's failure to convey him in a timely manner.

{¶ 4} The State opposed the motion to dismiss, arguing that although Hart had not been conveyed immediately upon filing of the judgment entry in Case No. 2019-CR-1754, he had nevertheless been earning credit toward his prison sentence in that separate, unrelated case and had been held in custody on more than one matter. The State asserted that Hart had already pled guilty in Case No. 2018-CR-1754 when the offenses in this case were committed, that he was taken into custody in both cases on the same date, and that he was held on separate bonds until the disposition of Case No. 2018-CR-1754. Thus, the State argued that the fact that Hart was not immediately conveyed to prison was irrelevant, "because one way or another, [he] was being held in custody on more than one charge."

{¶ 5} On March 9, 2020, the court overruled the motion to dismiss. The court determined that the "triple count" provision did not apply when a defendant was being held in custody pursuant to other charges, including serving a sentence of incarceration. Thus, the court found that Hart's speedy trial time should be computed on a "single day basis" and that the State had 270 days to try him in this case. The court determined that the 180-day speedy trial deadline of R.C. 2941.401 was not triggered until a defendant sent written notice to the prosecuting attorney and appropriate court of his place of imprisonment with a request for a final disposition of the matter; Hart had never done so. The court noted that Ohio courts have held that, when a defendant is imprisoned on a previous conviction, "R.C. 2945.71 ceases to govern and the two hundred and seventy day speedy trial deadline is tolled." The court concluded that, giving Hart "the benefit of

every doubt" that R.C. 2945.71 somehow applied here, the State was well within its 270 days to try him.

{¶ 6} On April 29, 2020, the court issued an order tolling speedy trial time based upon Am. Sub. H.B. 197 and the Covid-19 pandemic. Sua sponte, the court tolled Hart's speedy trial time "retroactively from March 9, 2020 to July 30, 2020, or until the emergency order is lifted by Governor DeWine, whichever is sooner."

{¶ 7} On July 7, 2020, Attorney Tamara Sack was appointed to represent Hart.

{¶ 8} On July 13, 2020, the court issued an order setting the jury trial for August 31, 2020. In a footnote, the court indicated that the trial date was the earliest date that defense counsel was available. The court found that Hart's speedy trial time was tolled until August 31, 2020. The court noted that Am Sub. H.B. 197 remained active and had not been rescinded, and that on March 27, 2020, the Ohio Supreme Court had issued Executive Order 03/27/2020 Administrative Actions, 2020-Ohio-1166, which tolled "all speedy trial and other time limitations as deemed necessary for public health and safety to comport with Am. Sub. H.B. 197, retroactive to March 9, 2020 and ending on July 30, 2020, or the expiration of Governor De Wine's Executive Order of 2020-01D, whichever is sooner." The court noted that this order had been ratified by the Ohio Supreme Court on May 15, 2020. The court also noted that on March 16, April 6, May 12, and May 27, 2020, the Montgomery County Common Pleas Court, General Division, had issued orders suspending all civil and criminal trials; moreover, the latest order, issued on June 26, 2020, extended the suspension of jury trials through July 30, 2020, "except when 'unique and unavoidable circumstances are presented.' "

{¶ 9} The court noted the multiple "current mandatory practices for public health, safety and welfare," including social distancing, barriers, facial coverings, disinfecting, and daily symptom checks. The court also found that the pandemic was "not abating," that "in order to comply with all of the foregoing and just plain common sense," Hart's speedy trial time was tolled "for the public health, safety and welfare," and that setting his trial for August 31, 2020 was "reasonable." Finally, the court noted that defense counsel was unavailable for earlier trial dates that had been offered to Hart.

{¶ 10} At a July 29, 2020 scheduling conference, the court referenced a prior conversation with Hart, when he was represented by attorney Carter, in which Hart asked that he be allowed to represent himself; the court was satisfied at that time that Hart "was in earnest" in wanting to represent himself. The court relieved Carter from his representation and indicated that Hart would be permitted to represent himself pro se at trial; however, Carter was appointed "as shadow counsel" for trial, to which Hart had objected. On the day of the scheduling conference, attorney Sack was present with Hart; she indicated that she was serving as Hart's counsel and fully representing him at trial. Hart confirmed Sack's representation.

{¶ 11} On August 17, 2020, a motion to dismiss the indictment for speedy trial violations was filed, signed by Hart. Sack certified that she had filed the motion on Hart's behalf, while he was proceeding pro se. Hart argued in the motion that he had "never received prompt written notification of indictment source and contents" or of his right to request a final disposition, and even if he had, the State's failure to convey him until November 7, 2019 "would not have left him enough time to exercise that right." The

State responded on August 17, 2020, asserting that Hart had provided no new factual basis for the motion to dismiss.

{¶ 12} At a scheduling conference on August 19, 2020, the court confirmed the August 31, 2020 trial date. Hart again asked the court to allow him to proceed pro se, without changing the trial date; he stated that he had a written waiver that he wanted to read and file. The court again emphasized the need for standby counsel or shadow counsel because Hart lacked legal training, indicated that it would provide a waiver form to attorney Sack for Hart to review with her, and confirmed that Hart was prepared to proceed to trial with Sack as standby counsel.

{¶ 13} The court overruled the motion to dismiss on August 19, 2020, noting that Hart's motion was "virtually identical" to his February 28, 2020 motion; it incorporated its March 9, April 29, and July 13, 2020 orders by reference. The court concluded that: 1) Hart had been serving a prison sentence "in an entirely separate matter" from August 27, 2019 through May 5, 2020; Hart had been aware of the charges in this case while he remained incarcerated in the Montgomery County Jail from August 28, 2019 until November 7, 2019, and while he was represented by counsel; and 3) Hart and his counsel could have invoked his speedy trial rights at any time pursuant to R.C. 2941.401, but they did not do so even after he was conveyed to prison in November 2019.

{¶ 14} On August 20, 2020, Hart filed a handwritten, pro se motion to dismiss, asserting that he had not waived his constitutional or statutory rights to speedy trial since he was arrested and incarcerated. The State opposed the motion on August, 25, 2020. On the same day, the State filed a motion in limine regarding the alleged speedy trial

violations, requesting that if Hart choose to testify, he be prohibited from testifying to the alleged speedy trial violations. On August 26, 2020, the court overruled the motion to dismiss.

{¶ 15} At an August 26, 2020 scheduling conference, attorney Sack represented to the court that she had reviewed the waiver form with Hart. The court noted that it had previously appointed Carter as standby counsel, to which Hart had objected, and that, considering Hart's repeated assertions of speedy trial violations, the court determined that if Carter were not serving as shadow counsel, the odds of going to trial on August 31 "weren't too good"; the court did not want to, "in essence, create another speedy trial issue," so Carter was to serve as Hart's shadow counsel. The court noted that Sack had subsequently indicated her availability to represent Hart if he changed his mind and wanted representation and that Hart had requested that she represent him. The court stated that a waiver document had never been executed and filed "because we didn't need to," but Hart had reversed course again and decided he wanted to represent himself. The court had a thorough and lengthy colloquy with Hart regarding his decision to represent himself and took a recess to allow Hart to talk to Sack. Thereafter, Sack and Hart represented to the court that Hart wanted Sack to serve as his trial counsel in all respects.

{¶ 16} Sack advised the court that Hart did not want to waive the jury for the having weapons while under disability charge and that, against counsel's advice, he wanted everything tried to the jury. Sack also told the court that Hart had again changed his mind about wanting to represent himself, and she requested a competency evaluation.

The court acknowledged that Hart had gone back and forth several times on this issue and that Hart's behavior had been "at best, unusual" and "erratic" for some time, such that a competency evaluation was appropriate. The court noted that the competency evaluation would toll the speedy trial time.

{¶ 17} Hart then indicated his desire to file a waiver of counsel. The trial court stated that doing so was not in Hart's best interest and that it made "no sense at all" to try the weapons under disability charge to a jury, putting before the jury his prior felony conviction for violence and having been a fugitive. The court also pointed to Hart's vacillation on the issue of representation.

{¶ 18} Also on August 26, 2020, defense counsel filed a motion for a competency and mental condition evaluation, noting that she had recently observed "irrational and erratic thought processes" which were concerning. The following day counsel filed a motion to withdraw as counsel, noting that she had received an email from Hart threatening to report her to the bar and to sue her for malpractice after she had filed the motion for a competency evaluation. On August 28, 2020, the court vacated the August 31, 2020 trial date and ordered a competency evaluation.

{¶ 19} On October 20, 2020, the court found Hart competent to stand trial based upon a report from the Forensic Psychiatry Center for Western Ohio. On the same day, the court granted Sack's motion to withdraw as counsel and appointed Attorney Dennis Lieberman to represent Hart.

{¶ 20} On October 21, 2020, the court reset the trial for January 19, 2021, which was the earliest possible trial date due to defense counsel's "backlog of trials." The entry

expressly found that Hart's speedy trial time had been tolled between August 26 and October 20, 2020, due to the competency evaluation. The court also found that Hart's speedy trial time was tolled until January 19, 2021, due to the court's congested docket, attorney Lieberman's availability and need to prepare, and the ongoing Covid-19 pandemic; the court noted that it had 18 trials scheduled between October 26, 2020, and January 19, 2021, and that the Montgomery County Common Pleas Court had a continuing order suspending all jury trials until December 31, 2020.

{¶ 21} On November 23, 2020, Hart executed and filed a waiver of counsel after a hearing.

{¶ 22} On December 4, 2020, the court issued an "Order Regarding Indictment," which related to a claim by Hart at a hearing on November 23, 2020, that he had never received the indictment. The court indicated that it had reviewed the September 5, 2019 arraignment conducted by a different judge and found that, despite Hart's numerous interruptions, the court had "appropriately arraigned him," and his attorney (Fogt) had acknowledged receipt of the indictment and had waived its reading and any defects therein. Although the court concluded that Hart had received the indictment, it ordered his current attorney, Lieberman, to provide him with an additional copy.

{¶ 23} On January 12, 2021, the court reset the jury trial for June 28, 2021. On February 22, 2021, the court issued an amended entry, adding a footnote that the June 28 trial date was the earliest date for which the Court, attorneys for the State, and standby defense counsel could be available.

{¶ 24} At the final pretrial on June 10, the court noted that on November 23, 2020,

it had reviewed the waiver of counsel form with Hart, and Hart had signed it. The form detailed all the charges and the court's advisements to Hart. The court asked Hart if he still intended to represent himself, and Hart indicated that he did. The court reviewed the form with Hart again on the morning of trial and assigned Lieberman as standby counsel.

{¶ 25} On June 18, 2021, Hart filed a motion to dismiss; he again asserted that his speedy trial rights had been violated, claiming that he had been in custody for approximately 670 days as of June 14, 2021. The court overruled the motion, noting that it was Hart's fourth such request. The court observed that Hart had been "incarcerated and serving a sentence on a different case until May, 2020" and that the primary reason for the delays after May 2020 had been the ongoing Covid-19 pandemic. The court also found that Hart had shown no prejudice.

{¶ 26} At a conference on the scheduled June 28, 2021 trial date, defense counsel Lieberman advised the court that Hart's brother had been attempting to retain a different attorney, Derek Farmer, to represent Hart; Lieberman had spoken to Hart's brother and to Farmer, who confirmed that he had spoken to Hart's brother but stated that he could not take the case. Lieberman stated that he and Hart's brother had had a couple of other conversations about different attorneys. The court discussed *State v. Lee*, 2d Dist. Montgomery No. 28125, 2020-Ohio-3987, noting that a court should err on "on the side of representation" by counsel, not self-representation, and if a defendant equivocated regarding self-representation, that was "a nonstarter" and the trial should not proceed with the defendant representing himself. At the conference, Hart stated that he had been unaware of his brother's actions and had not asked his brother or anyone else to get him

an attorney. But Lieberman advised the court that, in the conversations he had had with Hart's brother, the brother indicated that he had been acting on Hart's behalf and with Hart's knowledge.

{¶ 27} Although it recognized that various continuances had delayed Hart's trial, the court stated that there had been no assertion of any prejudice to Hart, such as witnesses who were no longer available. The court said that Lieberman would serve as trial counsel, but Lieberman represented that he could not try the matter on the scheduled date. The court had previously asked Hart to provide Lieberman with names of witnesses who could be subpoenaed to assist Hart, but Lieberman indicated that Hart had not done so. The trial court rescheduled the trial for the week of August 2, 2021, with Lieberman serving as trial counsel because of Hart's equivocation on the issue of representation.

{¶ 28} Before the start of trial, defense counsel renewed Hart's objections and motions relating to speedy trial, due process, and equal protection violations. The court overruled the objections. Defense counsel further advised the court that Hart wished to proceed pro se. Citing *Lee*, 2d Dist. Montgomery No. 28125, 2020-Ohio-3987, the court overruled the motion, noting that Hart had a continuing objection on the issue. Defense counsel advised the court that his standard practice was to waive a jury for having weapons while under disability, but that Hart had chosen not to do so.

{¶ 29} The jury trial was held from August 2-5, 2021.

{¶ 30} Brian Lewis, the administrative sergeant for the regional dispatch center for the Montgomery County Sheriff's Office where 911 calls are received, testified that the

office stores digital recordings for the radio and phone for 365 days. He identified State's Exhibits 1 and 2, with which he was familiar, as audio DVDs of phone calls relating to the incident at issue, which were received on August 18, 2019, at 17:15 and 17:16 p.m. The calls were played for the jury.

{¶ 31} Lisa Moore testified that she lived on St. John's Avenue on August 18, 2019 with her four children -- Anthony Kenny, 29; Laron McGee, 24; Tyrese McGee, 20, and Jessica McGee, 18[2] -- along with Laron's girlfriend, Izora Johnson. She testified that August 18th was a Sunday, and that she had worked half a day that day, from 6:00 a.m. to around 10:00 or 11:00 a.m. Moore described her home as two stories with two bedrooms upstairs and two on the first floor.

{¶ 32} Moore testified that when she got home on Sunday, August 18, Laron and Johnson were upstairs in their room, and Jessica was in her bedroom downstairs; Laron then left the home, and Moore prepared to give herself a perm around 5:00 p.m. Moore stated that, as she stood in front of her vanity mirror in her first-floor bedroom, Johnson came downstairs and Moore "started hearing gunshots." Moore told Johnson to get down, yelled for Jessica to stay in her room, and "ducked." Moore testified that bullets came through the mirror in her bedroom, "coming through the wall" from the living room, and her glass storm door was shattered "as the bullets were coming through the front door."

{¶ 33} Moore identified State's Exhibits 3 through 19 as photos of her home and belongings. In the photos, she identified broken glass from the security door as well as

---

[2] For clarity, the McGees will be referred to in this opinion by their first names.

five bullet holes in her front door. Moore also identified the wall between her bedroom and the living room, along with her couch. She stated that her front door was directly across from that wall, and that the photograph depicted bullet holes in the wall and in the couch; drywall was visible on the top of the couch. Moore stated that the vanity in her bedroom was directly behind her living room couch, and she identified a bullet hole in a photo of her vanity mirror. Moore testified that she had found a bullet on the floor in her room and had given it to a police officer. Moore called 911, but she had not seen who fired the shots.

{¶ 34} Johnson testified that Moore and Jessica had bedrooms on the first floor, she and Laron shared one upstairs bedroom, and Tyrese used the other upstairs bedroom. She stated that she had been watching a movie on August 18, 2019, and that she had stopped to get something to eat and drink. She stated that Jessica and Moore had been in their separate bedrooms downstairs and that Laron had left five minutes prior to the shooting; Tyrese was not home.

{¶ 35} Johnson testified that, on the night in question, she saw a red truck quickly "back up in front of the house" and stop; a "kind of stocky" black male wearing "a gray beater and some shorts" whom she had never seen before got out the car and started walking up to the house. The way the man had backed up to the house made Johnson "a little nervous," and she started toward Moore's room to ask her if she knew anyone with a red truck. Then the shooting started. Johnson testified that she believed there had been "a bigger white male with a lot of hair" in the truck.

{¶ 36} Johnson testified that she heard breaking glass and gunshots, then she

dove into Moore's room on the floor; she heard five or six shots and then "heard him pulling off." Johnson identified photos of the damaged windows at the home. When she heard Moore call 911, Johnson told Moore what she had seen so Moore could relay it to the police. Johnson testified that the police responded to the house, and she gave them a statement. Johnson stated that the perpetrator had used a revolver and shattered the glass of the front door.

{¶ 37} On cross-examination, Johnson stated that she had last observed the perpetrator walking up the sidewalk toward the porch; she "didn't technically see him pull the gun" and fire it. Johnson stated that, when the black man walked up to the house, he was "not even a foot away" from the porch, she was standing at the window, and no one else was nearby that she saw. She turned around, and there was gunfire less than three seconds later. Johnson testified that she saw something in the man's pocket, but she did not know what it was and had never seen a gun in his hand.

{¶ 38} Laron testified that, prior to August 2018, he had placed a $20 Geeni Wi-Fi camera from Walmart in Tyrese's front upstairs window; Laron had downloaded an application to his phone to connect to the camera. Laron testified that the camera was motion-activated to record videos with audio, and it saved the recordings. Laron testified that he had been visiting a friend when he learned about the shooting, and he proceeded home, where the police had already arrived. Laron realized he might have video of the shooting on his phone.

{¶ 39} Defense counsel objected at sidebar to the admission of the video recording of the incident (State's Exhibit 23), asserting that no one had identified it as a fair and

accurate depiction of what had occurred, that it was hearsay, and that there was insufficient foundation for admission. Defense counsel also argued that there was some question about where the video came from, because one detective's report indicated that Moore had provided the footage "from her surveillance camera in her son's bedroom."

{¶ 40} The court indicated that it would excuse the jury and Laron and view the recording to ascertain if it was probative and if its probative value outweighed any prejudicial effect.

{¶ 41} The court found "some indicia of reliability" with respect to the video, namely: the date stamp in the upper left corner was from August 18, 2019; the time (military time of 17:12, or 5:12 p.m.) was consistent with the testimony of the witnesses to that point; the video depicted a red truck, there had been testimony about a red truck pulling up; and the truck was on the wrong side of the street. The court acknowledged that "there may be a question about how this video was retrieved." The court stated that the video appeared "at first blush to be arguably hearsay" It then viewed the video and recalled Johnson to the stand, outside the presence of the jury, to testify as to whether "what she saw with her own two eyes looking out that window" was consistent with what was depicted on the video (thereby authenticating the video). The court stated that it would not allow Johnson to testify as to whether Hart was the man in the video.

{¶ 42} Johnson reiterated her testimony that she had not observed a gun during the incident. She stated that the red truck on the video was consistent with what she observed on August 18, 2019, and that the date-stamp on the video was the date of the shooting. When asked about the time-stamp on the video, she said it happened in the

evening but she was unsure of the specific time. Johnson reiterated that, during the incident, she had observed a black man dressed in a gray "beater" walk up the walkway toward the front door of her home. Johnson identified the chain link fence "just to the left of the red truck" in the video, the driveway of her home, and the walkway leading to the front porch. She stated that the homes depicted across the street in the video were the homes across the street from her home. When asked if she had any doubt that the red truck reflected in the video was in front of her St. John's Avenue home on the date of the shooting, she responded, "No, I know for sure he was."

{¶ 43} The court asked for the portion of the video reflecting the individual getting out of the truck and walking toward the house to be played for Johnson. Johnson confirmed that the video represented what she had observed on August 18, 2019, namely a black man dressed in a gray "beater" approaching the home, as she had testified. Defense counsel objected to Johnson's being recalled as a witness.

{¶ 44} Laron returned to the stand for questioning by the court. He again testified that he had purchased and installed the camera in his brother's window. He acknowledged that he had not witnessed any portion of the incident because he had not been present. The court questioned Laron about the video outside the presence of the jury, and Laron testified that he recognized the driveway, the front walk to his home, the chain-link fence parallel to the street, the awning, and his neighbors' homes. He stated that the surroundings depicted in the video were consistent with the surroundings of his home.

{¶ 45} When asked who retrieved the video after the shooting, Laron responded,

"I did, we all tried to pull it up. I did, mainly." Laron stated that he had learned about the shooting from Johnson by phone. He stated that the video was a fair and accurate depiction of what he had downloaded to his phone, and he had not altered it. Laron stated that Exhibit 23 was only a portion of what was recorded; the portion in which the subject pulled up and turned around was not included.

{¶ 46} In response to questions by the State, Laron stated that Moore and Johnson had also tried to view the video on their phones. The court stopped the prosecutor's questioning, noting that "this may very well be testimony that you want to take from" Laron in the presence of the jury.

{¶ 47} Defense counsel asked Laron how the video was given to law enforcement, and Laron indicated he did not know. He stated that he gave it to them, but he could not recall "how they got it in their hands," but probably through email. Laron testified that he had given the police the complete video that he had saved, not just the portion reflected in State's Exhibit 23.

{¶ 48} The court admitted State's Exhibit 23 under the "silent witness theory," citing *Midland Steel Prods. Co., v. Internatl. Union, United Auto., Aero. & Agricultural Implement Workers, Local 486,* 61 Ohio St.3d 121, 573 N.E.2d 98 (1991); *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.2d 1023; and *State v. Farrah*, 10th Dist. Franklin No. 01AP-968, 2002-Ohio-1918. The court concluded that State's Exhibit 23 had been authenticated by the testimony of Johnson and Laron. Defense counsel renewed his objection. The jury returned to the court room, and the State again questioned Laron about State's Exhibit 23 before playing the video for the jury. Laron

testified that he had provided the video to law enforcement.

{¶ 49} On recross-examination, Laron denied that he had never previously seen the red truck in the video. He testified that he did not remember how or if he had provided the video to law enforcement. Laron testified that there was no other video that he had downloaded beyond State's Exhibit 23.

{¶ 50} After defense counsel requested a sidebar to discuss the conflicting testimony outside the jury's presence regarding whether State's Exhibit 23 was a complete video, Laron acknowledged that there had been more video from the security camera that he was unable to save, and that Exhibit 23 contained the entire portion of the video that he was able to save.

{¶ 51} Officer Joseph Ambrose of the Dayton Police Department testified that on August 18, 2019, around 5:00 p.m., he and Officer Kyle Harris were in the area of James H. McGee Boulevard and Third Street when they received a "shots fired" call on the radio; they were given the address of 4649 St. John's Avenue. As far as Ambrose recalled, the report had said that a black male in a red truck with two white occupants had shot at the house and fled. Ambrose and Harris then encountered a red truck within a mile of the reported address.

{¶ 52} Ambrose identified a cruiser camera video and audio recording in two separate files of the officers' pursuit of the truck (State's Exhibit 24). The files were played for the jury, and Ambrose testified that, at 48 seconds, the officers saw something tossed out the window of the red truck; at that point, they were travelling south on North Gettysburg nearing Gardendale Avenue. This information was relayed to other crews.

**{¶ 53}** Ambrose testified that the recording stopped when he and Harris hit a large embankment, totaling the cruiser. At that point, Officer Derek Wagers passed them in an SUV; at the next driveway, the suspect vehicle had hit a parked vehicle in a driveway, and the suspect driver had fled on foot. Ambrose exited the disabled cruiser, ran north to Nicholas Avenue, ran west on Nicholas Avenue, and then observed the suspect running directly toward him about 15 seconds later.

**{¶ 54}** Ambrose testified that he drew his weapon and ordered the suspect to stop, but the suspect continued to run between houses on Nicholas, eventually tripping in one of the yards behind a house near the disabled cruiser. When the suspect fell to the ground, Ambrose sat on top of him to make an arrest. When Ambrose searched the suspect incident to arrest, he found a large bag that he believed, from his experience and training, to be methamphetamine; Ambrose removed it from the suspect's pocket. Ambrose identified the bag at trial (State's Exhibit 25) and described the process of securing it. Ambrose identified Hart as the person he had arrested. He also identified the black and gray clothing that Hart had been wearing at the time of his arrest.

**{¶ 55}** Ambrose transported Hart to the hospital, and Hart provided him with a name, social security number, date of birth, and age. Ambrose testified that Hart had identified himself as Ryan Hart, but Ambrose received a call from another officer, Officer Joshua Gundaker, informing him that the other occupants of the vehicle had provided the name Byron Hart, rather than Ryan Hart. After running the information of Byron Hart, Ambrose found a picture matching the man in custody, and Hart said, "oh, well, you got me." Ambrose informed Hart that there was a warrant for his arrest, which Hart indicated

that he knew.

{¶ 56} On cross-examination, Ambrose testified that he had not observed items thrown from the red truck, but that he had put the information in his report because that was what the other officer had relayed to him. After reviewing his report to refresh his recollection, he testified that the objects had been thrown from the passenger side of the vehicle.

{¶ 57} Officer Kyle Harris testified that he was driving a cruiser with Ambrose as his passenger on the day of the shooting; Ambrose had operated the computer, communicated with dispatch and other crews, and read "call comments" to him while he was driving. Ambrose advised Harris that a 911 caller/victim had stated that a black male driving a small red pickup truck, who possibly had two white males in the vehicle with him, was the suspect in the shooting into habitation incident which had just occurred at the reported address. At the time, Harris was turning off North James H. McGee onto North Gettysburg, in the direction of the St. John's Avenue address. When stopped at an intersection on North Gettysburg Avenue, a small Ford red Ranger pickup truck was also stopped on the other side of the intersection. The driver was a middle-aged black male with short hair and a gray tank top, and there appeared to be two to three white occupants inside the truck with him. Harris and Ambrose passed the truck, then turned around at their first opportunity and attempted to get a license plate number. A pursuit of the red truck ensued.

{¶ 58} Dayton Police Officer Craig Stiver, an evidence technician, responded to the St. John's Avenue address on August 18, 2019, to collect a spent bullet and take

photos. He identified the photos and a spent bullet he had collected from a bedroom of the home at trial. Stiver testified that he was subsequently dispatched to the area of Gettysburg and Gardendale Avenues, where a box of ammunition, some live rounds, and a revolver had been found; he also took photos of this area, which he identified at trial. Stiver stated that he had recovered four live rounds, the handgun, and the empty box of ammunition, which were identified for the jury.

{¶ 59} Further, Stiver was also dispatched to 3928 Nichols Road to photograph a Ford Ranger and its contents. He testified that a live bullet was recovered from the floorboard of the truck along with a spent casing, and he identified those items for the jury. In response to question from the court, Stiver indicated that the live rounds found fit the revolver, which was a .38.

{¶ 60} On cross-examination, Stiver testified that the only casing he found was on the floorboard of the truck. On redirect, he testified that a revolver does not eject casings like a semiautomatic handgun.

{¶ 61} Dayton Police Officer Joshua Erwin had been assigned to the west patrol operations on August 18, 2019; after roll call, he and his partner heard a crew report that they were in pursuit of a vehicle that had just been involved in a shooting in a habitation. Erwin and his partner "drove to Lakeview" and waited, but after observing a red Ford Ranger as described in the call, they became the second car in the pursuit. According to Erwin, the truck ran through a fence; his cruiser was unable to make it through, so he and his partner "disengaged"; they then proceeded to the St. John's Avenue address, where Officer Gallagher gave Erwin a bullet that he had received from Lisa Moore. Erwin

stated that the bullet had been retrieved from inside the residence.

{¶ 62} Officer Derek Wagers was also assigned to the west patrol operation division. He was at Miami Valley Hospital on August 18 on an unrelated call when he heard that another crew was pursuing a vehicle, and he proceeded to the area of the pursuit. Wagers stated that he was alone in his vehicle. He identified the cruiser video from his car, a portion of which was played for the jury (State's Exhibit 27). Wagers testified that he had observed a black male wearing a gray tank top and black shorts fleeing from the driver's side of his vehicle, but stated that he (Wagers) did not maintain pursuit since Ambrose and Harris were able to take the person into custody. Wagers stated that a white female and two children were in the vehicle, as depicted in Exhibit 27.

{¶ 63} Wagers stated that Hart had been placed in the rear of his cruiser, and he identified Hart in the video. Wagers stated that he had tried to identify Hart by typing the identifiers Hart provided (Ryan Garell Hart), but the picture of Ryan Hart on the Bureau of Motor Vehicles site did not match the suspect in his cruiser.

{¶ 64} Hillary Loucks, a forensic chemist at the Miami Valley Regional Crime Laboratory, who was designated as an expert, testified that she had tested State's Exhibit 25, the suspected methamphetamine, and found it to be methamphetamine with a net weight of 55.78 grams.

{¶ 65} Robert Burns, a firearms examiner at the Miami Valley Regional Crime Laboratory, testified that he examined State's Exhibits 34, 37, 56, and 57. Burns stated that Exhibit 37 was an operable Rohm RG 38S, "38 special caliber." He testified that State's Exhibit 34 was a fired cartridge casing; based upon a microscopic comparison of

test-fired casings from the weapon to the gum, he concluded that Exhibit 34 had been fired by Exhibit 37. Burns stated that State's Exhibits 56 and 57 were recovered bullets that he microscopically examined in comparison to test-fired bullets, and he opined that these bullets had also been fired from Exhibit 37.

{¶ 66} Matthew Gray, a detective for the violent offender unit of the Dayton Police Department, identified State's Exhibits 62 and 63 as judgment entries of conviction in which Hart had been the defendant. Gray also identified Hart in the courtroom.

{¶ 67} At the conclusion of the State's case, defense counsel made a general motion for acquittal on all counts and specific motions as to specific counts. Regarding Count 5, having weapons while under disability (fugitive from justice), defense counsel asserted that there was no evidence that Hart had known he was being sought by law enforcement. The court responded that there was testimony that Hart "knew there was a warrant for his arrest" and that a reasonable juror could conclude from the cruiser camera footage that someone, namely Hart, "was doing everything he could to avoid apprehension." The court overruled the motion as to Count 5.

{¶ 68} Regarding Count 6, tampering with evidence, defense counsel argued that acquittal was appropriate because Hart had been the driver of the truck, the evidence showed that the items thrown from the truck – a gun, ammunition, and an ammunition box --had been thrown from the passenger side, and, given the "very erratic nature of the chase," the driver would have been "too busy trying to drive" to throw things from the vehicle. Defense counsel also pointed out that a co-defendant in the case had already been convicted of tampering with evidence. On these bases, defense counsel argued

that an acquittal on tampering was appropriate.

{¶ 69} With respect to the co-defendant's case, the prosecutor stated that Hart's co-defendant had stated in her plea colloquy that she had taken drugs into the jail by "stuffing them - - hiding them in her private area"; the plea had not related to tossing a gun, ammunition, or an ammunition box out a window. Further, the prosecutor argued that, even if the co-defendant had been convicted of tampering based on the same conduct, a reasonable juror could infer that the driver had, in fact, tossed the weapon, ammunition and box out of the passenger window, which was only a short distance away. Arguing that the evidence supported either inference, the prosecutor continued:

> As long as the window's rolled down, that'd be easy enough to do. * * * [The jury] could buy your argument, Mr. Lieberman, that it's not your client that did it, or it wasn't the driver that did it. It was the passenger that did it, but I think they could make a logical inference that they disagree.
>
> So I think they're entitled to proceed. And I think they could also infer, if they were to conclude that Mr. Hart was the driver, that Mr. Hart was the shooter, that Mr. Hart knew he had a warrant out for him, that Mr. Hart was doing everything he could to elude capture by the police, including this protracted, erratic chase, and that the passenger, if it was indeed, she that tossed the items of evidence - - the gun, the ammunition, and the box, did so at his direction. I think they could infer that.

{¶ 70} Defense counsel also contested the weight of the methamphetamine, based on its being a compound substance, but the court found that other cases had

settled this question and that the weight of the compound substance or mixture controlled.

{¶ 71} The parties filed sentencing memoranda. Hart's memorandum included a request to merge counts and an attached affidavit of indigency "to be considered as it relates to any fines."

{¶ 72} The trial court sentenced Hart on August 25, 2021. The court noted that it had reviewed the presentence investigation report ("PSI") and the parties' sentencing memoranda. The court merged Count IV into Count V (two counts of having weapons while under disability), to which the State agreed, but it refused to merge Count VII, (improper handling of a firearm in a motor vehicle), citing *State v. Wilcox*, 2d Dist. Clark No. 2013-CA-94, 2014-Ohio-4954. AS discussed above, the aggregate sentence was 29.5 to 33.5 years.

{¶ 73} The trial court further expressly found that Hart had the means, or was expected to have the means, "to pay some or all of the costs of prosecution, restitution, or other financial sanctions." Hart's PSI stated that he was 35 years old, had completed the 11th grade, and had obtained his technician certificate in heating ventilation and air conditioning in 2021 while incarcerated. Also, the PSI stated that in 2018, Hart had reportedly been operating his late father's towing and haul company; he had also previously been employed at Select Industries Factory and Kroger. Based on these facts, the court ordered Hart to pay court costs, including jury costs to be paid in an amount to be determined by the clerk of courts. The court also ordered Hart to pay restitution to Moore, and it stayed the collection of court costs until restitution to Moore was paid in full. The amount of restitution was based on a quote Moore had provided

from Lowe's, which indicated that the cost to replace her front door and two windows had been $4,507.43.

{¶ 74} Hart appeals, asserting five assignments of error. His first assignment of error is as follows:

THE TRIAL COURT COMMITTED ERROR BY NOT PROPERLY GRANTING DISMISSAL DUE TO APPELLANT'S SPEEDY TRIAL RIGHTS BEING VIOLATED.

{¶ 75} Hart argues that both his statutory and constitutional speedy trial rights were violated. The State responds that multiple tolling events occurred throughout the case, along with "the lingering impact of the COVID-19 pandemic on the trial court's schedule," such that Hart's speedy trial rights were not violated. In reply, Hart argues that the "pandemic did not necessitate a two-year delay" and that his case should have been a "top priority" in the trial court's scheduling due to its being "a high-level criminal case." He also asserts that the competency evaluation requested by defense counsel in August 2020 was not necessary and should not have been granted, and thus the time should not be held against him.

{¶ 76} As this Court has stated:

"The right to a speedy trial is a fundamental right guaranteed by the Sixth Amendment to the United States Constitution, made obligatory on the states by the Fourteenth Amendment. Section 10, Article I of the Ohio Constitution guarantees an accused this same right." (Citation omitted.) *State v. Hughes*, 86 Ohio St.3d 424, 715 N.E.2d 540 (1999). Ohio's

statutory speedy trial provisions, R.C. 2945.71 et seq., constitute a rational effort to enforce the constitutional right to a speedy trial. *State v. Pachay*, 64 Ohio St.2d 218, 416 N.E.2d 589 (1980); *State v. Parker*, 113 Ohio St.3d 2017, 2007-Ohio-1534, 863 N.E.2d 1031, ¶ 13.

*State v. Sherrer*, 2d Dist. Greene No. 2015-CA-40, 2016-Ohio-3198, ¶ 8.

**{¶ 77}** Regarding Hart's statutory speedy trial rights, the following is well-settled:

On consideration of a defendant's challenge to a conviction based on an alleged violation of the defendant's statutory right to a speedy trial, the standard of review initially entails little more than a count of days pursuant to R.C. 2945.71. *State v. Ellington*, 2d Dist. Montgomery No. 26335, 2015-Ohio-2058, ¶ 12; *see also State v. Stevens*, 8th Dist. Cuyahoga No. 87693, 2006-Ohio-5914, ¶ 32. If a defendant "establishes a prima facie case of a violation of his right to a speedy trial, the burden then shifts to the State" to demonstrate either that the statutory limit was not exceeded, or that the State's time to bring the defendant to trial was properly extended. *See State v. Nichols*, 5th Dist. Richland No. 04 CA 56, 2005-Ohio-1771, ¶ 11, citing *State v. Butcher*, 27 Ohio St.3d 28, 30-31, 500 N.E.2d 1368 (1986).

*State v. Wagner*, 2d Dist. Miami No. 2020-CA-6, 2021-Ohio-1671, ¶ 12.

**{¶ 78}** R.C. 2945.71 provides the time period within which a trial must be held. R.C. 2945.71(C) states that a person against whom a charge of felony is pending "[s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C.

2945.71(E) states that, for "purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. * * *"

**{¶ 79}** R.C. 2945.72 establishes exceptions to allow speedy trial time to be extended. It provides:

> The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
>
> * * *
>
> (B) Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined, * * *.
>
> * * *
>
> (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
>
> * * *
>
> (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion;

R.C. 2945.73 sets forth the remedy, namely dismissal, if the speedy trial deadlines are not met.

**{¶ 80}** Hart's speedy trial time was tolled while he was serving his prison sentence

in Case No. 2018-CR-1754.   As this court has noted:

> When a defendant is incarcerated in this state on other charges, R.C. 2941.401[3], a specific statute, prevails over the general speedy trial statutes of R.C. 2945.71 et seq., and governs the time within which the state must bring him or her to trial.   See R.C. 2945.71(F); *State v. Munns*, 5th Dist. No. 2005-CA-0065, 2006-Ohio-1852, at ¶ 16; *State v. Mavroudis*, 7th Dist. No. 02 CO 44, 2003-Ohio-3289, at ¶ 27; *State v. Cox*, 4th Dist. No. 01 CA10, 2002-Ohio-2382, at ¶ 17; *State v. Pesci*, 11th Dist. No.2001-L-026, 2002-Ohio-7131, at ¶¶ 41-43; *State v. Ward*, 12th Dist. No. CA99-12-114, 2000 WL 1370993, at *4; *State v. Fox*, 8th Dist. No. 63100, 1992 WL 309353, at *1.   When the defendant is imprisoned on a previous conviction, R.C. 2945.71 ceases to govern and the two hundred and seventy day speedy trial deadline is tolled.   See *Cleveland v. Adkins*, 8th Dist. No. 83295, 2004-Ohio-1118, at ¶ 6, 156 Ohio App.3d 482, 806 N.E.2d 1007; *State v. Hill*, 4th Dist. No. 96 CA 4, 1996 WL 754250, at *6.   The provisions of R.C. 2941.401 control, and the one hundred and eighty day speedy trial deadline under R.C. 2941.401 does not begin to run until the defendant sends written notice of the place of his imprisonment and a request for a final disposition

---

[3] "When a person has entered upon a term of imprisonment in a correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, he shall be brought to trial within one hundred eighty days after he causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter * * *."   R.C. 2941.401.

of the matter to the prosecuting attorney and appropriate court. See R.C. 2941.401; *Adkins*, supra, at ¶ 6; *Hill*, supra, at \*7.

We have cited the great weight of authority we have found in support of the proposition that once a person under indictment has begun serving a prison sentence in another case, the provisions of R.C. 2941.401 apply, to the exclusion of the provisions of R.C. 2945.71, et seq., so that the running of speedy trial time under the latter statute is tolled. We have found no authority to the contrary. Although we consider this question to be a difficult one, the whole point of speedy trial provisions is to impose bright-line rules, by their nature arbitrary, to enforce a criminal defendant's constitutional right to a speedy trial. This interest would be ill-served by having different rules in different appellate districts. Therefore, we will follow the great weight of authority we have cited.

(Footnote added.) *State v. Stewart,* 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, ¶ 21-22. Hart did not trigger R.C. 2941.401 while he was in prison, and he was not entitled to assert any speedy trial deadline during his incarceration. Therefore, Hart's speedy trial time was tolled from November 7, 2019, when he was transported to prison, until February 13, 2020, when he was returned to the Montgomery County Jail.

**{¶ 81}** Pursuant to R.C. 2945.72(B), "the time within which an accused must be brought to trial is tolled from the date the accused files a motion challenging his or her competency to stand trial \* \* \* until the trial court makes a competency determination \* \* \*." *State v. Palmer*, 84 Ohio St.3d 103, 702 N.E.2d 72 (1998), paragraphs one and

two of the syllabus.   Hart's attorney filed the motion for a competency evaluation on August 26, 2020, and the trial court found Hart competent on October 20, 2020.

**{¶ 82}** Hart was granted six continuances between September 11, 2019, and November 6, 2019, which fell within the provisions of R.C. 2945.72(H).   The continuance granted on October 23, 2019, expired on October 30, 2019, before the October 31, 2019 motion was filed.

**{¶ 83}**  We have noted that, "due to the coronavirus pandemic, the General Assembly passed, and the Ohio Governor signed, Am.Sub.H.B. 197, which tolled speedy trial times that were set to expire between March 9, 2020, and July 30, 2020."   *State v. Lewis*, 2d Dist. Montgomery No. 28962, 2021-Ohio-1895, ¶ 40.   "The Supreme Court of Ohio also issued an order on March 27, 2020, tolling deadlines retroactively for the same period of time.   "   *Id.* at ¶ 41, citing *In re Tolling of Time Requirements Imposed by Rules Promulgated by Supreme Court & Use of Technology*, 158 Ohio St.3d 1447, 2020-Ohio-1166, 141 N.E.3d 974.   We agree with the State that "as a result of Am.Sub.H.B. 197, the days between March 9, 2020 and July 30, 2020, were excluded from the calculation of Hart's statutory speedy trial time.   As noted above, the trial court issued an order on April 29, 2020, tolling Hart's speedy trial time retroactively for that period.

**{¶ 84}** Furthermore, pursuant to R.C. 2945.72(H), "a court may grant a continuance upon its own initiative as long as it is reasonable."   *State v. King*, 70 Ohio St.3d 158, 162, 637 N.E.2d 903 (1994).   "This provision has been interpreted to permit courts to sua sponte continue an accused's trial beyond the time limit prescribed by R.C. 2945.71, but only when reasonable and only when the continuances are made by journal

entry prior to the expiration of the time limit." *Id.*, citing *State v. Lee*, 48 Ohio St.2d 208, 357 N.E.2d 1095 (1976), and *Aurora v. Patrick*, 61 Ohio St.2d 107, 399 N.E.2d 1220 (1980).

{¶ 85} On October 21, 2020, the court tolled the matter until January 19, 2021. The court noted its congested docket. *See State v. Hairston*, 2d Dist. Montgomery No. 20844, 2006-Ohio-2669, ¶ 15 ("It is well settled that docket congestion may be grounds for a reasonable continuance under R.C. § 2945.72(H), provided that the trial court gives a timely explanation for its action."). The court further noted that it had just appointed new defense counsel, Attorney Lieberman, and that Lieberman needed a reasonable time to prepare. The court further stated that it was continuing the trial due to Covid 19.

{¶ 86} The trial court issued another tolling entry on January 12, 2021, to June 28, 2021, citing temporary emergency orders issued by the General Division of the Montgomery County Court of Common Pleas suspending jury trials through March 27, 2021. The court also cited 2020 Ohio Atty Gen Ops. No. 2020-002 and Ohio Supreme Court guidance, including limiting in-person meetings. The court further noted that Montgomery County remained under a Level 3 public emergency. Finally, the court issued an amended tolling entry on February 22, 2021, until June 28, 2021.

{¶ 87} As this Court has previously noted:

> * * * [T]he Ohio Supreme Court recognized the seriousness of the public health emergency, noting that "[i]t is now December 2020, and we are approaching what could be the height of the COVID-19 pandemic. The daily numbers of confirmed COVID-19 cases, hospitalizations, and deaths

have significantly increased." *In re Disqualification of Fleegle*, 161 Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609, ¶ 5. The supreme court emphasized that, "[d]uring this public-health emergency, a judge's priority must be the health and safety of court employees, trial participants, jurors, and members of the public entering the courthouse." *Id.* at ¶ 8. It reiterated that "all Ohio judges have been advised [that] trial judges have the authority to continue trials for defendants on a case by case basis without violating speedy-trial requirements." *Id.* at ¶ 7. The supreme court cited R.C. 2945.72(H) and the Ohio Attorney General's opinion, which approved of the suspension of jury trials to prevent the spread of COVID-19 and opined that "they may do so consistent with state and federal speedy-trial obligations. * * * Although tolling speedy trial time by suspending jury trial activity is an extraordinary step, it is lawful – and responsible – to do so during a pandemic emergency." The supreme court held that it was reasonable to continue a trial because of a pandemic state of emergency. *Id.; see also State v. Voris*, 2d Dist. Miami No. 2021-CA-2, 2022-Ohio-152, ¶ 30 (the trial court lawfully scheduled defendant's jury trial outside of the statutorily-required speedy trial time, pursuant to R.C. 2945.72(H), based on the COVID-19 pandemic and the fact that the county remained in a state of emergency due to the virus).

*Sate v. Lovett*, 2d Dist. Montgomery No. 29240, 2022-Ohio-1693, ¶ 30. The trial court fully explained and justified its sua sponte continuances.

**{¶ 88}** Further, the time was tolled from February 28, 2020, until March 9, 2020 due to Hart's motions to dismiss:

**{¶ 89}** We agree with the State that it was well within the 270 days statutory time limitation to bring Hart to trial.   According to the following schedule, we conclude that 70 days had elapsed and that Hart's statutory speedy trial rights were not violated.

| Dates | Elapsed and Tolled Days |
|---|---|
| August 19, 2019[4] – September 11, 2019 | 23 days[5] |
| September 11, 2019 – October 29, 2019 | tolled due to motions |
| October 30, 2019 | 1 day |
| October 31, 2019 -- November 5, 2019 | tolled due to motion |
| November 6, 2019 | 1 day |
| November 7, 2019 – February 12, 2020 | tolled due to incarceration |
| February 13, 2020 – February 27, 2020 | 45 days (triple count) |
| February 28, 2020 – March 8, 2020 | tolled due to motion |
| March 9, 2020 – July 30, 2020 | tolled due to pandemic |
| July 13, 2020 – August 31, 2020 | tolled for new trial date |
| August 26, 2020 -- October 19, 2020 | tolled for competency evaluation |
| October 20, 2020 – January 18, 2020 | tolled - trial date vacated 8-28-20 |
| January 19, 2021 – June 27, 2021 | tolled by court sua sponte 1-12-21 |

---

[4] *See Stewart,* 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, at ¶ 2 ("the day of arrest is not counted when computing speedy trial time").

[5] As the trial court noted, the triple count provision did not apply while Hart was being held on these offenses and in Case No. 2018-CR-1754.

June 28, 2021 – August 2, 2021                    tolled by court sua sponte

{¶ 90} *Wagner*, 2d Dist. Miami No. 2020-CA-6, 2021-Ohio-1671, addressed constitutional speedy trial rights as follows:

> Although "statutory and constitutional speedy trial [rights] are [generally] coextensive," the constitutional right, as embodied in the Ohio Constitution and the United States Constitution, "may be broader than the * * * statutory right" in some circumstances. (Citation omitted.) *State v. Kadunc,* 10th Dist. Franklin No. 15AP-920, 2016-Ohio-4637, ¶ 19. To determine whether a defendant's constitutional right to a speedy trial has been violated, a court should apply the four-factor balancing test adopted by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *See, e.g., State v. Louis*, 2d Dist. Montgomery No. 27909, 2020-Ohio-951, ¶ 32. The factors include: (1) the length of the delay "between accusation and trial"; (2) the reason for the delay; (3) the defendant's assertion, if any, of his right to a speedy trial; and (4) the prejudice, if any, to the defendant. *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 88.
>
> A "delay becomes presumptively prejudicial as it approaches one year," and unless the length of the delay "is presumptively prejudicial, there is no necessity for inquiry into the other factors." *Barker* at 530; *Adams* at ¶ 89-90. None of the factors is controlling because a "balancing test

necessarily compels" a court to evaluate an alleged speedy trial violation "on an ad hoc basis," meaning that the court must consider the totality of the circumstances.  *Barker* at 530; *State v. Perkins*, 2d Dist. Clark No. 08-CA-0081, 2009-Ohio-3033, ¶ 8.

*Id.* at ¶ 14-15.

{¶ 91} A trial court's decision overruling a defendant's motion to dismiss on constitutional speedy trial grounds is reviewed for an abuse of discretion standard.  *State v. Cassell*, 2d Dist. Clark No. 2009-CA-64, 2011-Ohio-23, ¶ 12.  An "abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable.  *Id.* at ¶ 13; *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985).  It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.  *AAAA Ents., Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990).

{¶ 92} We conclude that an abuse of discretion has not been demonstrated.  As set forth above, Hart filed multiple motions to continue and motions to dismiss.  Time was tolled due to his competency evaluation, and the August 31, 2020, and January 19, 2021 trial dates were vacated. The court thoroughly explained its own sua sponte continuances, including the Covid 19 emergency.

{¶ 93} Moreover, Hart failed to demonstrate prejudice "of constitutional magnitude."  In his February 28, 2020 speedy trial motion, Hart claimed that he had not been promptly conveyed to prison after he was sentenced in Case No. 2018-CR-1754.

Yet after being conveyed, he failed to avail himself of R.C. 2941.401. While Hart suggests in his brief that "[a]t times he wanted to represent himself, and obviously his ability to gather evidence, contact witnesses, or otherwise prepare his defense was hindered by being incarcerated," Hart was not entitled to represent himself due to his erratic behavior and vacillation, as will be discussed further below, and he had not identified what specific evidence, witness, or trial preparation was lost because of the delay in bringing him to trial. Hart has not demonstrated a level of prejudice sufficient to establish a violation of his constitutional right to a speedy trial.

{¶ 94} Hart further argues that the "county jail had a detrimental impact on him because his liberty was restrained more than had he been sentenced to the penitentiary," where he asserts he would have had "more freedom to access recreational or/and rehabilitative services." Hart therefore argues that his "excessive pretrial detention" prejudiced his position. However, as the State asserts, "whatever prejudice Hart thinks he suffered by having to spend time in jail rather than prison had no impact on his speedy-trial rights."

{¶ 95} Based upon the record as a whole, and particularly given the unique circumstances created by the COVID-19 pandemic, the trial court did not abuse its discretion in finding that Hart's claims of statutory and/or constitutional speedy-trial violations lacked merit. Accordingly, Hart's first assignment of error is overruled.

{¶ 96} Hart's second assignment of error is as follows:

THERE WAS INSUFFICIENT, COMPETENT CREDIBLE EVIDENCE TO SUPPORT APPELLANT'S CONVICTIONS.

{¶ 97} Hart challenges the sufficiency of the evidence for all counts. He asserts that the evidence only supported that he was wearing clothing like the alleged perpetrator; the evidence did not support that he was the perpetrator. According to Hart, neither Moore nor Johnson established that he was the shooter.

{¶ 98} Hart argues that State's Exhibit 23, the home security video, was inadmissible. He cites *Midland Steel Prods.,* 61 Ohio St.3d 121, 129-30, 573 N.E.2d 98, which provides:

> The admissibility of photographic evidence is based on two different theories. One theory is the "pictorial testimony" theory. Under this theory, the photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on the witness' personal observation. * * * A second theory under which photographic evidence may be admissible is the "silent witness" theory. Under that theory, the photographic evidence is a "silent witness" which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness. * * *

*Id.* at 129-130, quoting *Fisher v. State*, 7 Ark.App. 1, 5-6, 643 S.W.2d 571, 573-574 (1982).

{¶ 99} Hart argues that Laron testified that he was not home at the time of the shooting, and therefore the video, although admitted over objection, could not have been admissible under the first theory as photographic evidence; it was not illustrative of

Laron's testimony based on personal observation. Regarding the silent witness theory, Hart asserts that Laron's testimony and experience with the recording system were insufficient to demonstrate that the video was reliable. According to Hart, the system cost only $20, the video was incomplete, and Laron claimed the system was motion-detecting; in Hart's view, the process and the mechanisms for recording the video should have required expert testimony, so that the defense could challenge or determine the alleged reliability. Moreover, Hart asserts that, even if the video were properly admitted, it only established that a black man was around the property at the time of the shooting.

{¶ 100} Hart asserts that the testimony by law enforcement officers also did not "establish a consistent story" to support that he was the perpetrator. He argues that "inconsistent stories" about the truck and who was in it were insufficient to support his conviction.

{¶ 101} In particular, Hart argues that his conviction for tampering with evidence was not supported in the record; because he was allegedly the driver, and the gun came out of the passenger-side window, he asserts that the evidence was insufficient to establish that he disposed of the alleged gun.

{¶ 102} The State responds that the surveillance video from Moore's home "clearly showed Hart get into the driver's seat of the truck with the handgun in his possession," and the fact that the gun was thrown out the passenger-side window was of no consequence. According to the State, there was no evidence to suggest that Hart could not have thrown the gun out the passenger-side window while he was driving. Moreover, Officer Wagers testified that he personally observed Hart flee from the driver's side of the

vehicle. Regarding Hart's suggestion that the security video was unreliable and inadmissible, the State asserts that the "totality of the evidence * * * satisfied the reliability and relevancy requirements for the admission of video-recorded evidence."

**{¶ 103}** As this Court has noted:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). We apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

When reviewing a weight of the evidence challenge, a court reviews "the entire record, weighs the evidence and all reasonable inferences,

considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Further, while "sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17. Accordingly, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

Additionally, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the

peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24.

*State v. Sizemore*, 2d Dist. Montgomery No. 28817, 2021-Ohio-4159, ¶ 13-16.

{¶ 104} We have reviewed the State's evidence herein. Having examined the evidence in a light most favorable to the State, and deferring to the jury's assessment of credibility, we conclude that, if believed, the evidence would convince the average mind of Hart's guilt beyond a reasonable doubt for each of his offenses, and that his convictions were not against the manifest weight of the evidence.

{¶ 105} R.C. 2923.161 proscribes improperly discharging a firearm at or into a habitation and provides: "(A) No person, without privilege to do so, shall knowingly do any of the following: (1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."

{¶ 106} Johnson testified that she observed a stocky black male, in a "gray beater and some shorts," whom she did not know, "back up in front of the house" in a manner that concerned her; he then approached the house on foot. Johnson stated that she did not observe anyone else in the area, and she saw "something in his pocket." After she turned around to approach Moore, she heard gunshots and dove to the floor. Johnson stated that she heard Hart leave in his truck, and squealing tires were audible the home

security video. Moore described bullets coming through her mirror and shattering her storm door. The photographic evidence was consistent with her testimony.

{¶ 107} Regarding the video, Laron testified that he installed the Geeni Wi-Fi camera in the front upstairs window, connected it to Wi-Fi, and downloaded an application to his phone to connect to the camera. In determining the admissibility of the video, it was significant to the court that the date and time-stamp on the video were consistent with the witnesses' testimony about when the incident occurred. After viewing the video, Johnson returned to the stand outside the presence of the jury and stated that the red truck in the video was consistent with what she had personally observed on August 18, 2019. She further identified the area around her home in the video, including the chain link fence to the left of the red truck, the driveway, the walkway leading up to the home, and the homes across the street. Johnson confirmed that the video reflected the black man in a gray "beater" that she had observed approach her home on August 18.

{¶ 108} Laron also testified that he recognized his driveway, the walkway to the home, the adjacent chain link fence, the front porch and awning, and the neighboring homes in the video. Laron testified that State's Exhibit 23 was the portion of the video that he had saved to his phone and retrieved, and that he had not altered it. Consistent with *Midland Steel Prods.,* we conclude that the court properly admitted the video under the "silent witness theory" following Johnson's and Laron's authentication of it. While expert testimony is often offered to explain matters beyond the common knowledge and experience of lay persons, the trial court could have reasonably concluded that expert testimony was not required herein regarding the operability and reliability of the security

camera. The video depicted Hart getting out of the truck, looking around, approaching the house, being briefly hidden from view by the porch awning while gun fire was heard, then returning to the truck while still firing his gun, and driving away from the home. Other occupants were visible in the truck, and Hart was wearing a gray tank top-style shirt and black shorts. The number of occupants in the vehicle was not a material fact. We note that the angle of the video was consistent with having been recorded in the upstairs window, and the person depicted in the rear of Wagers' cruiser in State's Exhibit 27 is the same individual depicted in State's Exhibit 23, in the same clothing.

{¶ 109} Stiver testified that he responded to Moore's address to collect a spent bullet from her bedroom and to the area of Gettysburg and Gardendale Avenues, where an empty box of ammunition, a revolver, and four live rounds had been found; State's Exhibits 38-55 depicted these items before they were moved. Stiver testified that he was also dispatched to photograph the red truck and its contents, and he identified State's Exhibits 28-33 as his photos. Stiver testified that he recovered a live bullet on the floorboard of the truck, and the live round fit the .38 revolver.

{¶ 110} Burns, a firearms examiner, testified that State's Exhibit 37, the Rohm RG, 38 special caliber revolver, was operational and that a microscopic comparison revealed that State's Exhibit 34, the shell casing, had been fired by State's Exhibit 37; two other recovered casings had also been fired from State's Exhibit 37. Based upon the foregoing, Hart's conviction for improperly discharging a weapon into a habitation was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 111} R.C. 2925.11(A) provides: "No person shall knowingly obtain, possess, or

use a controlled substance or a controlled substance analog." R.C. 2925.11(C)(1)(c) states that, if "the amount of the drug involved exceeds the bulk amount but is less than fifty times the bulk amount, aggravated possession of drugs is a felony of the second degree, and the court shall impose as a mandatory prison term a second degree felony mandatory prison term." Ambrose testified that he had removed a suspected bag of methamphetamine from Hart's pocket, and a forensic chemist testified that she had tested the substance and found it to be methamphetamine with a net weight of 55.78 grams. Thus, Hart's conviction for aggravated possession was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 112} R.C. 2921.331 proscribes failure to comply with an order or signal of a police officer. It states, in part:

(B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

(C)(1) Whoever violates this section is guilty of failure to comply with an order or signal of a police officer.

* * *

(5)(a) A violation of division (B) of this section is a felony of the third degree if the jury or judge as trier of fact finds any of the following by proof beyond a reasonable doubt:

(i) The operation of the motor vehicle by the offender was a proximate cause of serious physical harm to persons or property.

(ii) The operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property.

**{¶ 113}** Exhibit 24, the cruiser camera video identified by Ambrose, reflected his and Harris's lengthy pursuit of Hart. In the course of the pursuit, Hart had gone the wrong way and driven through several yards and through a chain length fence, all at an excessive speed while being pursued by multiple officers signaling him to stop with lights and sirens; in doing so, he endangered the lives of his passengers and others along the way. Ambrose testified that his cruiser was totaled in the course of the pursuant, and the video showed the cruiser hitting an embankment and stopping. Ambrose further testified that Hart stopped because he hit a parked car in a driveway. Hart's conviction for failure to comply with an order or signal of a police officer was supported by sufficient evidence and not against the manifest weight of the evidence.

**{¶ 114}** R.C. 2923.13 provides:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

(1) The person is a fugitive from justice.

(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

**{¶ 115}** As the trial court determined, a reasonable juror could have concluded

from the cruiser camera footage that Hart "was doing everything he could to avoid apprehension." Ambrose also testified that, in the course of identifying Hart, Ambrose informed Hart that there was a warrant for his arrest, and "he said he knew." Further, the State introduced two judgment entries of conviction related to Hart through the testimony of Matthew Gray, a detective: Exhibit 62, Hart's 2013 conviction for attempted felonious assault; and Exhibit 63, Hart's conviction in Case No. 2018-CR-1754 for having weapons while under disability (prior offense of violence). Gray also identified Hart in the courtroom. Based upon the foregoing, Hart's convictions for having weapons while under disability -- fugitive from justice and prior offense of violence -- were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶ 116} R.C. 2921.12 proscribes tampering with the evidence; it states: "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶ 117} Ambrose testified that he was in the area of North Gettysburg and Gardendale Avenues when Harris stated that something had been thrown out the window of the truck in the course of their pursuit. On State's Exhibit 27, Harris can be heard saying "just tossed something out the window here." Officer Stiver testified that he responded to the area and photographed the items, namely the empty box of ammunition, the revolver, and 4 live rounds, as they were found, and he identified them for the jury. As the trial court found in addressing Hart's motion for acquittal, "a reasonable juror could

infer that * * * the driver did, in fact, toss the weapon and the ammo box out of the passenger window, because we're not talking about a very great distance." The court further noted that, with the window rolled down, "that'd be easy enough to do." There was sufficient evidence to support Hart's conviction for tampering with evidence, and it was not against the manifest weight of the evidence.

{¶ 118} R.C. 2923.16 proscribes improper handling of a firearm in a motor vehicle: "(B) No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." In the home security video, Exhibit 23, Hart can be clearly seen entering his vehicle with the revolver in his hand; the weapon was later found discarded in an area where he had been observed. Hart's conviction for improper handling of a firearm in a motor vehicle was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 119} Finally, R.C. 2921.13 proscribes falsification: "(A) No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies: * * * (3) The statement is made with purpose to mislead a public official in performing the public official's official function." Ambrose testified that the occupants of the red truck had provided the name of Byron Hart to law enforcement, whereas Hart had provided the name "Ryan Hart." Ambrose stated that, when he looked up Byron Hart in his computer, he found a picture to match Hart, and then Hart said "Oh, well, you got me." Officer Wagers testified that Hart had provided the name of Ryan Garrell Hart, and that when Wagers compared the

Bureau of Motor Vehicles photo of Ryan Hart, it did not match the suspect in his cruiser. Under these circumstances, a reasonable juror could have concluded that Hart had attempted to mislead law enforcement officers in performing their official function. Hart's conviction for falsification was supported by the evidence and was not against the manifest weight of the evidence.

{¶ 120} Hart's second assignment of error is overruled.

{¶ 121} Hart's third assignment of error is as follows:

THE TRIAL COURT ERRED BY FAILING TO MERGE THE IMPROPER HANDLING CONVICTION.

{¶ 122} Hart asserts that his two counts of having weapons while under disability and his count of improper handling of a firearm in a motor vehicle should have merged into one offense for sentencing. He asserts that the three offenses were of similar import or significance because they all involved having a weapon in the vehicle and were not committed separately and because he was alleged to have possessed only one weapon. Hart cites *State v. Russell*, 2d Dist. Montgomery No. 24443, 2021-Ohio-871, in support of his argument.

{¶ 123} The court did merge the two counts of having weapons while under disability at sentencing, so the only issue in this respect on appeal is whether improper handling of a firearm should also have also merged. The State asserts that Hart was under a weapons disability on August 18, 2019, because he was a fugitive from justice as a result of a previously-issued arrest warrant in an unrelated felony case; the State argues that Hart had committed the offense of having weapons while under disability as

soon as he acquired the firearm. On the other hand, according to the State, Hart committed the separate offense of improper handling of a firearm in a motor vehicle only after he got into the red truck with the firearm, carrying it in a manner that the firearm was accessible to the operator or any passenger without leaving the vehicle. The State argues that Hart's possession of the firearm while he was outside of the truck and shooting at Moore's house further demonstrated that the offenses were committed with separate conduct. The State cites *State v. Clark,* 2d Dist. Clark No. 2015-CA-23, 2016-Ohio-1560.

**{¶ 124}** In reply, Hart notes that having the gun was the "same conduct" that resulted in the convictions for having weapons while under disability and improper handling of a firearm. According to Hart, there was no evidence to suggest that he got into the vehicle with the weapon or that he knew, before deciding to possess and shoot the weapon, that it was in the vehicle. He relies on *State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489. Hart asserts that "general possession of a firearm throughout the course of events is not automatically deemed separate animus."

**{¶ 125}** As this Court has noted:

In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court of Ohio clarified the applicable standard to use when determining whether offenses merge as allied offenses of similar import, and stated as follows:

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the

analysis must focus on the defendant's conduct to determine whether one or more convictions may result because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 30-31.

*State v. Crossley*, 2020-Ohio-6639, 164 N.E.3d 585, ¶ 16 (2d Dist.).

**{¶ 126}** In *Russell,* 2d Dist. Montgomery No. 24443, 2021-Ohio-871, the defendant argued that his convictions for aggravated robbery and felony murder should have been merged. *Id.* at ¶ 18. The court analyzed the issue as follows:

Relying on the provisions of R.C. 2903.02(B) and 2911.01(A)(1), this court has held previously that a defendant can "commit aggravated robbery and [felony] murder with the same conduct," inasmuch as "a victim could die from the use of a deadly weapon in the course of an aggravated robbery, resulting in the victim's murder." *McGail,* 2015-Ohio-5384, 5 N.E.3d 513, at

¶ 54. We find no reason in the instant case to depart from our holding in *McGail*; [the victim] Troutwine died in the course of a single, continuous sequence of events that culminated in the commission of aggravated robbery and felony murder, with the offenses occurring essentially at the same time. In the absence of any evidence that Troutwine had been deprived of property before being shot, the State lacks factual support for its argument that the aggravated robbery was complete at the moment Russell's gun discharged, but even assuming that the aggravated robbery was complete, Troutwine was nevertheless murdered in the course of the robbery. Consequently, we hold that Russell did not commit the offenses of aggravated robbery and felony murder separately.

We hold further that the two offenses were of similar import or significance. The evidence indicates that Troutwine died before Russell was able to deprive him of his property. *See* Appellee's Brief 5-6 and 11, fn.3. Being deceased, Troutwine was not harmed for any practical purpose by the loss of his property, and arguably, Russell's theft of Troutwine's property could, at that point, have harmed only Troutwine's estate. Moreover, the "examin[ation] [of] a defendant's conduct" for purposes of a merger analysis is "an inherently subjective determination," and on the facts of this case, we find that the sole relevant harm suffered by Troutwine was the loss of his life. *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 32.

Finally, we hold that Russell did not commit the offenses of aggravated robbery and felony murder with "separate animus" or motivation within the meaning of R.C. 2941.25(B). The State did not prove at trial that Russell acted with a separate intent to kill Troutwine, given that proof of such intent was unnecessary to obtain a conviction for murder under R.C. 2903.02(B), and the record is long since closed. As it stands, the record establishes that Russell killed Troutwine accidentally, rather than purposefully, and because Russell's gun discharged during the struggle between Russell and Troutwine, we find that Russell's use of force was not "far in excess of what was necessary to accomplish the robbery." *See McGail* at ¶ 57. Russell's assignment of error is sustained.

*Russell* at ¶ 20-22.

{¶ 127} In *Clark*, 2d Dist. Clark No. 2015-CA-23, 2016-Ohio-1560, Clark appealed from his convictions for possession of heroin and having a handgun while under disability. *Id.* at ¶ 1. The facts were as follows: Officer Nichols observed Clark, a suspect in a domestic violence dispute, driving an SUV. Nichols attempted to pull the SUV over when Clark failed to signal a turn. Officer Elliott, who was half a block behind, observed Clark flee the SUV carrying a black bag. After briefly losing sight of Clark, Elliott saw Clark again, without the black bag. *Id.* at ¶ 2. John Blue lived across the street from where Elliott caught up to Clark, and Blue told Elliott that he saw Clark put something in a nearby trash can. Elliott retrieved a 30-round magazine, a black bag containing a handgun, and heroin. *Id.* at ¶ 3.

**{¶ 128}** This Court determined as follows:

Here, Clark contends that the weapons-under-disability and improper-handling offenses are allied offenses of similar import because they were committed as one brief act, with one animus. But on facts similar to those here, we have held that these two offenses are committed with different conduct, at different times, and with separate animuses. In *State v. Wilcox*, 2d Dist. Clark No. 2013-CA-94, 2014-Ohio-4954, we said that the defendant "committed the offense of having weapons while under disability when he (necessarily) acquired the gun before he got into the SUV." *Wilcox* at ¶ 20. And we said that the defendant "committed the improper-handling offense when he brought the gun into the SUV." *Id.* Given the time sequence of the separate acts in *Wilcox*, we concluded that the offenses did not merge. *Compare State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489, ¶ 67 (concluding that the offender's convictions for having a weapon under disability and for felonious assault merged when the same weapon was used to commit both offenses and there was evidence that the offender had "obtained the gun with the immediate intent of shooting" the victim).

*Clark* at ¶ 8.

**{¶ 129}** In a footnote in *Clark*, Judge Hall, the author, noted that he had dissented in part on the merger issue in *Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489; Hall took the view in *Fairman* that the two offenses had been committed by different acts:

Fairman had acquired the disability that prevented him from having a firearm by committing a felony of violence long before he used a firearm to shoot the victim, and that separate act was unrelated to the felonious assault. *Clark* at ¶ 8, fn. 1.

**{¶ 130}** In Hart's case, the trial court merged Counts 4 and 5, the two counts of having weapons while under disability. We agree with the State that on the day of the incident, Hart was under a weapons disability, and he had violated R.C. 2923.13(A)(1) as soon as he acquired the firearm, whether he was in a vehicle with the weapon or not. Hart only committed improperly handling of the firearm in a motor vehicle when knowingly transported or had the firearm in the truck in a manner that it was accessible to him or any other passenger without leaving the vehicle. Hart was also in possession of the firearm while shooting into the home outside of the truck. Based upon the foregoing, we conclude that the trial court did not err in failing to merge Counts 5 and 7.

**{¶ 131}** Hart's fourth assignment of error is as follows:

THE TRIAL COURT COMMITTED ERROR BY IMPOSING FEES WITHOUT FINDING APPELLANT HAD THE MEANS TO PAY.

**{¶ 132}** Hart asserts that the court costs were not specified in the judgment entry, and he "worries that these costs may eventually include other costs determined by the Clerk, but not expressly [determined] by the court." He also asserts that he lacks the means to pay, and the trial court did not state in its judgment entry that he had the present or future ability to pay before imposing sanctions.

**{¶ 133}** The State responds that the trial court explicitly found that Hart had the future ability to pay, and there was "no requirement that the specific amount of court costs

be identified at sentencing." The State also notes that Hart did not object to the imposition of court costs or restitution or request that the court waive court costs. Although Hart attached a financial disclosure form to his sentencing memorandum, he asked only that it be considered with respect to any fines. The State points out that fines are not the same as court costs and, although Hart's drug conviction required a mandatory fine, no fine was imposed. The State also notes that, because a sentence must include an order to pay the costs of prosecution, there is no requirement that a defendant's ability to pay be considered.

{¶ 134} Regarding restitution, "R.C. 2929.18(A)(1) authorizes a trial court to impose restitution as part of a sentence in order to compensate the victim for economic loss. The statute also provides procedures for determining the amount of restitution ordered." *State v. Lalain*, 136 Ohio St.3d 243, 2013-Ohio-3093, 994 N.E.2d 423, ¶ 20. R.C. 2929.18(A)(1) states:

> If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense.

{¶ 135} As this Court has noted:

> R.C. 2929.19(B)(6) requires the trial court to consider defendant's

present and future ability to pay before imposing any financial sanction under R.C. 2929.18. *State v. Twitty*, 2d Dist. Montgomery No. 24296, 2011-Ohio-4725, ¶ 23. Financial sanctions include, for example, restitution, fines, and reimbursement of the costs of community control sanctions, confinement, or monitoring devices. R.C. 2929.18.

Court costs are governed by R.C. 2947.23. Court costs are not financial sanctions. *State v. Smith*, 3d Dist. Allen No. 1-07-32, 2007-Ohio-6552, ¶ 11. Consequently, R.C. 2929.19 is inapplicable to court costs, and the trial court need not consider a defendant's ability to pay under R.C. 2929.19 prior to imposing court costs. *E.g, id.*; *Columbus v. Kiner*, 10th Dist. Franklin No. 11AP-543, 2011-Ohio-6462.

Under R.C. 2947.23, a trial court is required to impose court costs against all convicted defendants, even those who are indigent. Se*e State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. However, "despite the mandatory language * * * requiring the imposition of court costs, a trial court may waive the payment of costs." (Emphasis in original.) *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 11. It is also possible that, during the collection process, the clerk of courts may waive the collection of court costs for indigent defendants. See *White* at ¶ 14 (noting that R.C. 2929.14 was silent as to the collection of costs from indigent defendants).

A defendant seeking a waiver of the payment of court costs must

move for such a waiver at sentencing.[6]  *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164; *State v. Stutz*, 2d Dist. Montgomery No. 24489, 2011-Ohio-5210, ¶ 16.  The trial court, however, has no duty to waive court costs, and R.C. 2949.092 does not provide standards for such waiver.  *Id.*, citing *State v. Costa*, 2d Dist. Greene No. 99 CA 14, 1999 WL 957647 (Sept. 3, 1999). * * *

* * *

Moreover, the court's imposition of court costs is not erroneous due to the court's failure to specify the amount of court costs at sentencing. (The judgment entry imposes costs in the amount of $1,964.34.)  The calculation of the amount of court costs is a ministerial act.  *Threat*t at ¶ 21. Thus, we have held that the failure to specify the amount at sentencing does not affect the order's finality and the itemized bill may be calculated later. *State v. Murillo*, 2d Dist. Montgomery No. 21919, 2008-Ohio-201, ¶ 14.

(Footnote added.)  *State v. Lux*, 2d Dist. Miami No. 2010-CA-30, 2012-Ohio-112, ¶ 44-47, 49.

{¶ 136} Although Hart did not object to the order of restitution, the record reflects that the court expressly considered his PSI and his present and future ability to pay, and it stayed the payment of the other costs until the restitution to Moore was paid.

{¶ 137} Hart did not request a waiver of the payment of court costs at sentencing,

---

[6] R.C. 2947.23(C), effective in 2014, states: "The court retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution, including any costs under section 2947.231 of the Revised Code, at the time of sentencing or at any time thereafter."

and he cannot challenge the imposition of court costs on direct appeal. Hart's fourth assignment of error is overruled.

{¶ 138} Hart's fifth assignment of error is as follows:

THE TRIAL COURT COMMITTED ERROR BY FAILING TO ALLOW APPELLANT TO PROCEED PRO SE, WITH STAND BY COUNSEL, AT TRIAL.

{¶ 139} Hart argues that, prior to trial, when defense counsel represented to the court that Hart wanted to proceed pro se, the trial court should have inquired about the request and, if it was found to be knowing, voluntary and intelligent, the court should have allowed appellant to proceed *pro se* with standby counsel present. He argues that he was "clear and unequivocal about proceeding *pro se* the day of trial."

{¶ 140} In *State v. Lee*, 2d Dist. Montgomery No. 28125, 2020-Ohio-3987, upon which the trial court relied, we stated:

We conduct an independent review to determine whether a defendant voluntarily, knowingly, and intelligently waived his right to counsel based on the totality of the circumstances. "Courts are to indulge every reasonable presumption against the waiver of a fundamental constitutional right including the right to be represented by counsel." *State v. Dyer*, 117 Ohio App.3d 92, 95, 689 N.E.2d 1034 (1996).:

We appreciate that waiver of counsel is a stormy sea for a trial court to navigate. There is even a foundational question as to whether a defendant is waiving a right (assistance of counsel) or

asserting a right (self-representation). Further, the self-representation right has itself been limited by the allowance of appointment of standby counsel over the self-represented defendant's objection, *McKaskle v. Wiggins*, (1984), 465 U.S. 168, 178-179, 104 S.Ct. 944, 79 L.Ed.2d 122, and the mandatory representation by counsel at trial on the ground the defendant is competent to stand trial, but lacks the mental capacity to conduct his trial unless represented. *Indiana v. Edwards*, (2008), [554] U.S. [164], 128 S.Ct. 2379, 171 L.Ed.2d 345. And if the judge makes the wrong call, either the complete denial of counsel, *Johnson v. United States*, (1997), 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718, citing *Gideon [v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)], supra, or the denial of self-representation constitutes structural error which requires automatic reversal. *McKaskle, supra; State v. Reed*, (1996), 74 Ohio St.3d 534, 660 N.E.2d 456.

*State v. West*, 2d Dist. Greene No. 2015-CA-72, 2017-Ohio-7521, ¶ 47, quoting *State v. Gatewood*, 2d Dist. Clark No. 2008 CA 64, 2009-Ohio-5610, ¶ 33-34.

To ensure that a waiver of counsel is made knowingly, intelligently and voluntarily, the trial court must make sufficient inquiry to determine whether a defendant fully understands and intelligently relinquishes that right. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d

1144; *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976). This Court has previously noted the U.S. Supreme Court's holding that:

" '* * * "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel.  This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." [*Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).]  To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand.  The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility.  To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.  A judge can make certain that an accused's professed waiver of counsel is understandingly and

wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.' (Citations omitted.)"

*State v. Albert*, 2d Dist. Montgomery No. 23148, 2010-Ohio-110, ¶ 12, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723-724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) and citing *State v. Engle*, 183 Ohio App.3d 488, 2009-Ohio-1944, 917 N.E.2d 817, ¶ 9-10.

The Tenth Circuit noted in *United States v. Hansen*, 929 F.3d 1238, 1249-1251 (10th Cir. 2019):

The "tried-and-true method" for a district court to assess whether a waiver is being made knowingly and intelligently is to "conduct a thorough and comprehensive formal inquiry of the defendant on the record." *[United [State v.] Vann*, 776 F.3d 746, 763 [(10th Cir. 2015)] (quoting *United States v. Willie*, 941 F.2d 1384, 1388 (10th Cir. 1991)). Such a formal inquiry typically takes place in the context of a waiver hearing, customarily referred to as a *Faretta* hearing, in recognition of the Supreme Court's seminal waiver case, [*United States v. Faretta*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).] *See id. Faretta* hearings are intended to "ensure[ ] the defendant is not unwittingly or impulsively disposing of his constitutional right to counsel," *id.*, by determining whether "the defendant is aware of the nature of the charges, the range of

allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se," *[United States v. Williamson* ("Brett Williamson")]*, 859 F.3d [843,] 862 [(10th Cir. 2017)] (quoting *Vann*, 776 F.3d at 763). These topics of inquiry stem from Justice Black's plurality opinion in *Von Moltke* [332 U.S. at 724, 68 S.Ct. 316].

* * *

The Supreme Court has emphasized that the requisite thoroughness of the district court's inquiry into the relevant factors should be viewed through a "pragmatic" lens—that is, the degree of thoroughness should correspond to how "substantial" and "obvious" the dangers of self-representation are at any particular stage of the criminal proceedings. *Patterson v. Illinois*, 487 U.S. 285, 298, 299-300, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); see [*Iowa v. Tovar*, 541 U.S. 77, 90, 124 S.Ct. 1379, 158 L.Ed. 209 (2004)]. ("Patterson describes a 'pragmatic approach to the waiver question,' one that asks 'what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage,' in order 'to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.' " (quoting *Patterson*, 487 U.S. at 298, 108 S.Ct.

2389)). Thus, as relevant here, the Supreme Court "require[s] a more searching or formal inquiry before permitting an accused to waive his right to counsel at trial than [it] require[s] for a Sixth Amendment waiver during postindictment questioning." [*Id.* at 229.] More specifically, "[w]arnings of the pitfalls of proceeding to trial without counsel ... must be 'rigorous[ly]' conveyed." *Tovar*, 541 U.S. at 89, 124 S.Ct. 1379 (second alteration in original) (quoting *Patterson*, 487 U.S. at 298, 108 S.Ct. 2389).

"[W]e 'indulge in every reasonable presumption against waiver.' " *United States v. Simpson*, 845 F.3d 1039, 1046 (10th Cir.) (quoting *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)), * * *; *see Von Moltke*, 332 U.S. at 723-24, 68 S.Ct. 316 ("To discharge this duty [of inquiry] properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." (emphasis added) (footnote omitted)); *United States v. Padilla*, 819 F.2d 952, 956 (10th Cir. 1987) ("The task of ensuring that defendant possesses the requisite understanding initially falls on the trial judge, who must *bear in mind the strong presumption against waiver." (emphasis added)); United States v. Williamson* ("John Williamson"), 806 F.2d 216, 219-20 (10th Cir. 1986) ("Courts indulge every presumption

against the waiver of fundamental constitutional rights. ... [D]oubts concerning an attorney waiver must be resolved in the defendant's favor ...." (citations omitted)).

Nevertheless, the Supreme Court has not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88, 124 S.Ct. 1379. Relatedly, the Court has acknowledged that "[t]he information a defendant must possess in order to make an intelligent election ... will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.*; *see Johnson*, 304 U.S. at 464, 58 S.Ct. 1019 ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

Our caselaw embodies the substance of the Supreme Court's pragmatic approach. Notably, in *Padilla*, although we held that "the trial judge should conduct an inquiry sufficient to establish a defendant's knowledge and understanding of the factors articulated in *Von Moltke*," we also made clear that "[n]o precise litany is prescribed" for the court's knowing-and-intelligent inquiries.

[*Padilla*], 819 F.2d at 959.

And, relatedly, our cases have repeatedly stressed that the knowing and intelligent nature of the waiver of the right to counsel turns on the "totality of the circumstances, including the background, experience, and conduct of the defendant." *John Williamson*, 806 F.2d at 220; *see Vann*, 776 F.3d at 763 ("We reflect on the totality of the circumstances to decide whether a defendant has knowingly [and intelligently] decided to proceed pro se."); *Padilla,* 819 F.2d at 958 (recognizing that "the question of an intelligent waiver turns not only on the state of the record [including presumably the court's inquiry into the *Von Moltke* factors in a *Faretta* hearing], but on all the circumstances of the case, including the defendant's age and education, his previous experience with criminal trials, and representation by counsel before trial" (emphasis added)); [*United States v. Weninger*, 624 F.2d [163] at 164 ("To ascertain whether [a defendant] knowingly and intelligently waived his right to counsel, we must consider 'the total circumstances of the individual case including background, experience and the conduct of the accused person.' " (quoting *United States v. Warledo*, 557 F.2d 721, 727 (10th Cir. 1977))); *see also Turner*, 287 F.3d at 983 (endorsing an inquiry into "the surrounding facts and circumstances" to determine whether a

defendant knowingly and intelligently waived the right to counsel); *cf. John Williamson*, 806 F.2d at 219 (noting that "[e]ach case must be reviewed individually, with the objective of determining whether the judge fully inquired into the circumstances").

In *United States v. Ductan*, 800 F.3d 642 (4th Cir. 2015), the Fourth Circuit further noted:

> In addition to requiring that a waiver be knowing and intelligent as a constitutional minimum, we have imposed one other requirement.   In *Fields*, we noted the "thin line between improperly allowing the defendant to proceed pro se, thereby violating his right to counsel, and improperly having the defendant proceed with counsel, thereby violating his right to self-representation."   [*Fields v. Murray*,] 49 F.3d [1024] at 1029 (internal quotation mark omitted).   Acknowledging that "[a] skillful defendant could manipulate this dilemma to create reversible error," we held that a waiver of counsel through the election of self-representation must be more than knowing and intelligent: it must also be "clear[ ] and unequivocal[ ]."   *Id.*   We explained that this requirement "greatly aids the trial court in resolving this dilemma" by allowing the court to presume that "the defendant should proceed with counsel absent an unmistakable expression by the defendant that so to proceed is contrary to his wishes." *Id.* (emphasis added).

*Id.*, quoting *Fields v. Murray*, 49 F.3d 1024, 1029 (4th Cir. 1995).

*Lee* at ¶ 40-43.

{¶ 141} Hart directs our attention to *State v. Watson*, 132 Ohio App.3d 57, 62, 724 N.E.2d 469 (8th Dist.1998), wherein Watson argued that he had been improperly denied his right to self-representation. The Eighth District determined as follows:

> * * * [O]nce the appellant clearly and unequivocally informed the trial court that he wished to represent himself, the court was obligated to determine whether the defendant knowingly, voluntarily, and intelligently waived his right to counsel. The court's failure to inquire whether appellant knowingly, intelligently, and voluntarily waived his right to counsel violated appellant's Sixth Amendment right to defend himself.

*Id.* at 66.

{¶ 142} While Watson's demand for self-representation was unequivocal, such was clearly not the case here. As noted above, at the July 29, 2020 scheduling conference, the court indicated that at an earlier date, Hart had requested to represent himself, and that the court had satisfied itself that Hart "was in earnest." Hart then indicated that he wanted Attorney Sack to represent him. At the pretrial conference on August 19, 2020, Hart notified the court that he wanted to represent himself with Sack as standby counsel, and the court provided a waiver form for Sack to review with Hart. On August 26, 2020, less than a week before the scheduled trial date of August 31, 2020, Sack advised the court that she had reviewed the waiver form with Hart. After a lengthy colloquy about waiving counsel, the court took a recess to allow Hart to talk to Sack;

thereafter, Hart indicated that he wanted Sack to represent him in all respects at trial. Then, after discussing having the weapons while under disability count tried to the bench, Hart again changed his mind. At this point, Hart requested a competency evaluation, and the court granted the motion. On June 10, 2021, at a final pretrial conference, the court noted that Hart had executed a waiver of counsel form on November 23, 2020, and Lieberman had been assigned as standby counsel. In its entry of June 28, 2021, the court noted Hart's "ongoing, unrelenting equivocation about self-representation" and revoked Hart's right to proceed pro se, noting Lieberman's representation that Hart's brother had been searching for substitute counsel.

{¶ 143} We cannot conclude that the record reflects an intelligent and competent waiver by Hart. Considering the totality of the circumstances, especially Hart's repeated equivocation, the trial court could not have been certain that Hart's November 23, 2020 waiver was understandingly and intelligently made. While the court represented that it had conducted the thorough and formal inquiry required before the waiver was executed and noted that it intended to do so again on the first day of trial, Hart impulsively vacillated. The court was required to indulge every reasonable presumption against waiver. Hart was facing eight charges in a complex trial. Hart's PSI stated that he had only an eleventh grade education, and the court noted that he had never before represented himself. Based upon the foregoing, Hart's fifth assignment of error is overruled.

{¶ 144} Having overruled all of Hart's assigned errors, we conclude that we nevertheless must remand the matter to the trial court for resentencing. In imposing sentence, pursuant to the Reagan Tokes Act, the trial court failed to advise Hart of all the

notifications set forth in R.C. 2929.19(B)(2)(c), and they also were not included in the judgment entry of conviction. Further, pursuant to R.C. 2929.144, since the court imposed consecutive sentences, it was required to establish an aggregate minimum term by adding the minimum terms of the qualifying offenses to the definite terms (8 yrs. + 8 yrs. + 36 mos. + 36 mos. + 36 mos. + 18 mos. = 26.5 years) for the felonies. It was then required to calculate the maximum term by adding 50 percent of the longest minimum term of eight years, or four years (26.5 + 4 = 30.5 years for the felonies). The court was then required to set forth the aggregate minimum term of 26.5 years and the maximum term of 30.5 years for the felonies in the judgment entry of conviction. *See State v. McLean*, 2d Dist. Montgomery No. 29268, 2022-Ohio-2806. The trial court's calculation was incorrect. Upon remand, the court is instructed to comply with the Reagan Tokes Act in imposing sentence.

{¶ 145} The judgment of the trial court is affirmed in part and reversed in part, and the matter is remanded for resentencing.

. . . . . . . . . . . . .

WELBAUM, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French

Anthony J. Richardson, II
Hon. Steven K. Dankof